UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JAMES EDWARD JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CAUSE OF ACTION NO. |
| | § | 1:22-cv-1050 |
| BRANDON SALTER, SAMUEL NOBLE, | § | |
| and KATHERINE ALZOLA, in their | § | |
| individual capacities, and the CITY OF | § | |
| AUSTIN, TEXAS; | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S COMPLAINT

Plaintiff James Edward Johnson brings this 42 U.S.C. § 1983 case against Defendants Brandon Salter, Samuel Noble, and Katherine Alzola, officers of the Austin Police Department, because they used brutal excessive force against him, and against Defendant City of Austin for its practices that enabled and directly caused such brutal and excessive force to be employed.

### I.  PARTIES

1.  Plaintiff James Edward Johnson is a resident of Austin, Texas.

2.  Defendant Brandon Salter was at all relevant times a police officer with the Austin Police Department, and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Salter was acting under color of law as an Austin Police Department officer. Salter may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

3.  Defendant Samuel Noble was at all relevant times a police officer with the Austin Police Department, and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Noble was acting under color of law as an Austin Police Department officer. Noble may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

4.    Defendant Katherine Alzola was at all relevant times a police officer with the Austin Police Department, and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Alzola was acting under color of law as an Austin Police Department officer. Alzola may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

5.    Defendant City of Austin is a municipality that operates the Austin Police Department and employed Salter, Noble, and Alzola at all relevant times. The City's policymaker for policing matters at the time of the incident was Interim Police Chief Joseph Chacon, who is now the Police Chief. The City may be served with process through its City Manager at 301 W. 2nd Street, Austin, TX 78701.

## II.  JURISDICTION AND VENUE

6.    As this case is brought pursuant to 42 U.S.C. § 1983, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

7.    This Court has general personal jurisdiction over Defendants as they are located in or reside in Travis County, Texas.

8.    This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendants which occurred in Travis County, Texas, which is within the Western District of Texas.

9.    Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Travis County, which is within the Western District of Texas.

## III.  FACTS

**A. SALTER BEAT JOHNSON AND NOBLE ELECTROCUTED JOHNSON WITHOUT JUSTIFICATION WHILE ALZOLA STOOD BY AND DID NOT STOP THEM.**

10.  Shortly after midnight on August 22, 2021, Plaintiff James Edward Johnson, who suffers from chronic mental illness, experienced a mental health crisis, so a loved one called 911 to get him mental health care.

11.  Instead of sending trained mental health officers, the Austin Police Department dispatched officers Brandon Salter, Samuel Noble, and Katherine Alzola to Johnson's home.

12.  Noble had encountered Johnson before, knew that he was not dangerous, and knew that Johnson suffered from chronic mental illness.

13.  Noble communicated this information to Salter and Alzola.

14.  After they made contact with Johnson, and after several minutes passed, Johnson explained that he was not a threat to anyone and told the officers he wanted them to leave.

15.  Salter told Johnson through his closed door, "I just want to talk to you."

16.  Johnson replied from inside his home that he was not a threat to anyone and he wanted the officers to leave.

17.  Salter instructed Johnson to leave his home.

18.  Johnson complied, slowly stepped out of his home, raised his empty hands over his shoulders, and showed both of his hands were visibly empty.

19.  Upon opening his door, Johnson immediately saw Salter and Alzola with their service weapons drawn and pointed at him.

20.  Noble was behind Johnson, so the officers knew that Johnson could not see Noble.

21.  At all relevant times, Johnson was completely unarmed, never threatened the officers, and was wearing nothing but close-fitting shorts and socks.

22.   The area was well lit and all three officers could see Johnson was unarmed and that he had nowhere to hide a weapon on his person.

23.   At this time, the officers could see that Johnson was not a threat to himself or others.

24.   At this time, none of the officers had reason to believe Johnson had engaged in a crime.

25.   Johnson, complying with Salter's early statements that he just wanted to talk to him, began calmly talking to Salter while keeping his empty hands above his shoulders.

26.   Despite this, and despite knowing that Johnson was experiencing a mental health crisis, Salter pointed his firearm at Johnson and began yelling over Johnson's efforts to talk.

27.   Salter knew that yelling at Johnson with his gun drawn would make an ordinary person fear for their safety and was particularly inappropriate during a mental health crisis.

28.   Salter knew that his conduct was inappropriate as it escalated, rather than de-escalated, the situation.

29.   Alzola also knew Salter's conduct was inappropriate, but did not intercede and continued to brandish her firearm at Johnson.

30.   Noble also knew Salter's conduct was inappropriate, but he also did not intercede.

31.   In response to Salter's threatening provocation, Johnson peacefully stepped away from the officers, while continuing to raise his hands to show the officers they were empty and calmly repeating that he was not a threat, and re-entered his home.

32.   Unbeknownst to Johnson, as Johnson began closing the door to his home, Noble rushed Johnson from behind.

33.   Without warning, Noble shot Johnson in the back using a TASER as Johnson stood inside his home.

34.   All three officers then charged into Johnson's home.

35. Salter then yelled at Johnson while he was being electrocuted, "get on the ground."

36. Johnson complied, sat on the floor, and told the officers, "I didn't do anything."

37. Johnson then raised his hands over his head, again showing he was visibly unarmed.

38. The area was well lit and the officers could see Johnson's hands were empty and there was no weapon within reach.

39. Salter then yelled at Johnson to "get on your stomach, now!"

40. Johnson complied, lying on his stomach and holding his hands out where the officers could see they remained empty.

41. Salter then turned Johnson's head to the right by grabbing the back of Johnson's head and putting his weight onto Johnson's head, thereby pressing the left side of Johnson's face into the floor.

42. Meanwhile, Alzola took control of both of Johnson's hands and pressed her weight onto Johnson's back and his right, upper thigh.

43. Noble stood over Johnson's left leg and held his TASER against it.

44. Without justification, Salter began to forcefully punch the exposed right side of Johnson's face approximately four times in a row, crushing Johnson's jaw in between Salter's fist and the floor.

45. Next, Salter and Alzola released Johnson so that Noble could electrocute him again with the TASER.

46. Johnson was never fighting the officers.

47. At no time did any of the officers have any reason to believe Johnson was fighting them.

48. Johnson was never reaching for a weapon.

49.  At no time did any of the officers have any reason to believe Johnson was reaching for a weapon.

50.  On information and belief, at the time of this incident, Salter, Noble, and Alzola were not certified in mental health crisis intervention.

51.  On information and belief, at the time of this incident, Salter, Noble, and Alzola were not qualified to provide mental health care.

52.  Despite the obviously excessive force, none of the Defendant officers intervened to stop Salter from mercilessly beating Johnson or to stop Noble from electrocuting him.

53.  Defendants had an opportunity to stop the brutal attack, but each chose not to intervene, preferring to watch Johnson be injured or join in.

54.  All told, the Defendants' use of excessive force and failure to intervene caused Johnson to suffer significant injuries—including a broken jaw—requiring medical treatment, that left a pool of blood on the floor of his home.

55.  Defendants did not arrest Johnson or charge him with a crime.

   **B.  THE CITY OF AUSTIN HAS A ROUTINE CUSTOM OF USING EXCESSIVE FORCE AND FAILING TO INTERVENE.**

56.  Upon information and belief, Salter, Noble, and Alzola were never trained that they have a constitutional obligation to prevent their fellow officers from using excessive force.

57.  At the time of this incident, no APD officer had ever been disciplined for failure to intervene to stop excessive force.

58.  This failure to train and supervise was a moving force causing APD officers to routinely fail to intervene to stop other officers from using excessive force, despite a long and well-publicized history that APD leadership (including Chief Chacon), and the City Council are well aware of.

59.   As officers are not trained to stop one another's use of excessive force, and are not disciplined for failing to stop one another's use of excessive force, unchecked excessive force by APD officers is common.

60.   As a consequence, officers not intervening to stop a use of excessive force has become the de facto practice/policy of APD and the City of Austin which is well-known by the City's policymakers, including Chief Chacon.

61.   Among numerous other incidents where APD officers have failed to intervene to stop other officers from using excessive force, APD officers failed to intervene to stop the unconstitutional use of excessive force in the following instances (among many others):

   a. **Carlos Chacon** – On April 29, 2011, APD Officers Eric Copeland and Russell Rose violently assaulted Carlos Chacon. Carlos Chacon had called the police to report he was the victim of a robbery. The officers alleged that Carlos Chacon failed to comply quickly enough with their orders to lay on the ground, and began electrocuting him with their TASER while punching his body. Neither officer intervened to stop the other from assaulting Carlos Chacon. A jury awarded Carlos Chacon significant damages based on the officers' excessive force.

   b. **Byron Carter** – On May 30, 2011, Officer Nathan Wagner fatally shot Byron Carter, Jr., who was only 20 years old. Carter was in a vehicle driven by a 16-year-old child, L.W., while exiting a tight parallel parking space after 11:00 pm. Unbeknownst to Carter and L.W., Wagner and his partner were nearby on foot, and had been following Carter and L.W. surreptitiously without suspicion of any crime. L.W. heard Carter say, "go," in a fearful tone, so he accelerated out of the parking space. Wagner claimed that the car sped towards him and his fellow officer, and that he (incorrectly and uncredibly) believed it

struck his partner and was dragging him beneath the vehicle. As a result, Wagner fired his weapon five times into the driver's side doors as the car drove away. Wagner's shots wounded L.W. and killed Carter. Wagner's partner did nothing to intervene and stop the shooting, even as the car drove away. In ensuing excessive force litigation, The District Court for the United States Western District of Texas, Judge Lee Yeakel, denied summary judgment to Wagner on May 20, 2013. Although neither officer was disciplined by APD, then-Police Monitor Margo Frasier and a Citizen Review Panel told the then-chief that the shooting was unjustified.

c.  **Pete Hernandez** – On June 7, 2012, APD Officer Jesus Sanchez used excessive force to tackle Pete Hernandez, whose only "crime" was exiting a Wal-Mart store. As Hernandez walked through the parking lot, an APD police officer suddenly yelled from behind him to "stay," and then, "get on the ground." Confused, Hernandez stopped—he testified that all he heard was to "Move out of the way," not "get on the ground"—and, less than four seconds after the first command, Sanchez executed a flying tackle into Hernandez, slamming him into the ground. Investigation revealed a third APD officer ordered police to "grab" Hernandez because he was supposedly walking toward a stolen truck occupied by another person. The ordering officer had incorrectly assumed Hernandez was an accomplice merely because he was walking through the parking lot, and Sanchez had, in turn, assumed that the order to "grab" Hernandez justified a flying tackle. None of the many APD officers present intervened to stop Sanchez's use of excessive force. The City found Sanchez did not violate any policies. But a jury found Sanchez used excessive force, awarding Hernandez $877,000 on February 8, 2016 (later reduced on remittitur).

d. **Caroline Callaway** – On February 4, 2015, APD Sergeant Adam Johnson and APD Officer Patrick Oborski were conducting a blood draw of Callaway with Sheriff's deputies and a nurse. Callaway, a 140-pound, 22-year-old woman, was placed into a restraint chair in a padded room with several deputies, the two APD officers, and a nurse present. Although Callaway did not resist, she was placed in a mask that covered her entire face, impeding her ability to see and breathe. This induced a panic attack, causing her to involuntarily shake. Sergeant Johnson placed his boot on her arm to pin it in place. Someone else applied a chokehold to Callaway. Oborski knew Callaway had been diagnosed with anxiety, but did not inform his compatriots. Neither Johnson nor Oborski intervened to stop the use of excessive force. In ensuing litigation by Callaway, The District Court for the United States Western District of Texas, Judge Sam Sparks, denied summary judgment to Johnson and Oborski, including for bystander claims, on July 28, 2016. (That September, Callaway was found not guilty of the DWI for which Oborski had arrested her.)

e. **Grady Bolton** – On February 9, 2015, APD Officers Manuel Jimenez, Michael Nguyen, and Rolando Ramirez approached Bolton after Bolton was told to leave a bar on 6th Street. Officer Jimenez escalated the encounter by suddenly grabbing Bolton's wrist, twisting it behind Bolton's back, and attempting to kick out Bolton's legs to collapse his body to the ground. Instead of intervening to stop Officer Jimenez, Officer Johnson joined in the use of force, including by hitting Bolton in the neck. Next, Officer Nguyen also did nothing to stop the force, instead joining and repeatedly kicking Bolton with his knee. In ensuing litigation by Bolton, the District Court for the United States Western District of

Texas, Judge Sam Sparks, denied summary judgment to officers Jimenez, Nguyen, and Ramirez on May 25, 2018.

f. **Joseph Cuellar** – On February 15, 2015, Cuellar, who was intoxicated, encountered four APD officers on horseback on 6th Street, including APD Detective Otho Deboise. When Cuellar came close to the horses, Detective Deboise ordered him to back away. Cuellar complied, but in a dancing motion. Deboise reacted by grabbing Cuellar and throwing him to the ground. None of the other three officers intervened to stop Deboise. In ensuing litigation by Cuellar, the District Court for the United States Western District of Texas, Judge Sam Sparks, denied summary judgment to Detective Deboise on April 6, 2018.

g. **Gregory Jackson** – On December 20, 2015, Jackson was attempting to cross to the North side of 6th Street with his party when officers were about to close the street. He encountered APD Officers Jason Jones and Brian Huckaby on bicycles, among many other patrol officers in vehicles and on horseback. Jones' bike bumped into Jackson, they had an eleven second conversation, then Jones suddenly grabbed Jackson to place him under arrest. Jackson complied and placed his hands behind his back, but was swarmed by APD officers, including Huckaby and Jones, who repeatedly punched him in the face. Although a large number of APD officers were present and could see Jackson was not resisting, none of them intervened to stop the use of excessive force. The District Court for the United States Western District of Texas, Magistrate Judge Andrew Austin, denied summary judgment to the two officers on October 11, 2019.

h. **Jason Roque** – On May 2, 2017, APD Officer James Harvel shot at Jason Roque—who had been threatening to shoot himself in the head, but never threatened anyone else— three times, including twice after Roque dropped his BB-gun and was stumbling away

from the police. Though four other APD officers were on the scene, none of them did anything to prevent Harvel from continuing to fire on Roque. Neither Harvel nor any of the four officers was disciplined. In ensuing litigation by Roque's survivors, the District Court for the United States Western District of Texas, Judge Lee Yeakel, denied summary judgment to Harvel on March 23, 2020. Judge Yeakel's order was affirmed by the Fifth Circuit Court of Appeals in a published opinion, 993 F.3d 325, on April 1, 2021. The matter subsequently settled for $2,250,000.

i. **Justin Grant** – On July 4, 2018, Justin Grant had an argument with security at a bar who refused to let him rejoin his party. Grant walked away, but APD officers Gadiel Alas and Corey Hale approached Grant from behind. Alas and Hale grabbed Grant without warning, then violently threw him to the ground. Once Grant was on the ground, Alas escalated further by electrocuting Grant with his TASER while Alas sat on top of Grant. Instead of intervening to stop Alas' excessive force, Hale then punched Grant in the face repeatedly. Alas then punched Grant in the face repeatedly as well. Though one of the officers complained to his supervisor that he had injured his hand by violently punching Grant in the face, neither Alas nor Hale were disciplined by APD.

j. **Michael Yeager-Huebner** – On November 18, 2018, Yeager and his girlfriend were heading back to their hotel from 6th Street when four unidentified assailants attacked Yeager while he waited at a crosswalk. APD Officers Bradley Hoover and Timothy Skeen witnessed the assault, dispersed the assailants, and then followed Yeager to a nearby parking lot where they immediately threatened to electrocute him with a TASER. Then a third officer, Dusty Jester, sprinted 30-40 yards to intentionally tackle Yeager, pulling him to the ground, and then began to mercilessly punch him in the face. Instead of

stopping Jester, Hoover and Skeen piled on—and called for backup, leading to a massive dog pile of officers pummeling Yeager. Jester was given a reprimand but no additional training, while neither Hoover nor Skeen was disciplined (or retrained) whatsoever. Subsequent civil litigation settled for $99,000.

k. **Javier Ambler** – On March 28, 2019, APD Officer Michael Nissen arrived at the scene of a car wreck caused by Williamson County Sheriff's deputies who had chased the driver, Ambler, into Austin for allegedly failing to dim his headlights and not pulling over. As Nissen arrived, the deputies already had Ambler at gun point and had TASERed him three times. The officers ordered Ambler, who was unarmed and visibly obese, to lay on the ground on his stomach. Ambler warned the officers, "I have congestive heart failure" and "I can't breathe" as they tried to force him to lie flat. Ambler told the officers he was trying to comply, but the officers insisted he flatten further despite his obvious inability to do so due to his obesity, and despite his repeated cries that "I can't breathe" and "I'm not resisting." Instead of stopping this, Nissen helped the deputies worsen Ambler's plight by pulling one of his arms further behind his back. The officers then shocked Ambler with the TASER again and put a knee into his back to press him further into the pavement before handcuffing him behind his back. Ambler stopped breathing following the excessive use of force. As a result, Ambler died. On March 30, 2021, the two Williamson County deputies were indicted for their role in killing Ambler.

l. **Paul Mannie** – Also on March 28, 2019, numerous officers, including officers Chance Bretches and Gregory Gentry, mercilessly punched and kicked Mannie in the face while they had him pinned to the ground and he was not resisting. Although many officers were present, none of them intervened to stop the obviously excessive force. Chief Chacon was

certainly aware of the incident; while APD decided not to discipline the officers, Bretches was indicted for aggravated assault by a public servant on January 20, 2021.

m. **2020 Black Lives Matter/ George Floyd Protests** – Dozens of APD officers shot at non-violent demonstrators with kinetic projectiles fired from shotguns and launchers. Despite the extensive police presence at the demonstrations, including numerous officers who could have intervened to prevent demonstrators from being seriously injured, no bystander officers intervened to protect unarmed civilians. This failure to intervene and put a stop to the illegal, unconscionable, and unreasonable shooting left numerous innocent individuals at the protest with serious, life altering injuries. Not a single officer has been disciplined for the intentional firing of kinetic projectiles into crowds or the failure to intervene to stop their misuse during the protests, even though Chief Chacon and his predecessor Manley personally knew that shotguns and kinetic projectiles were being used inappropriately, dangerously, and against nonviolent people. More than twenty APD officers have since been indicted for assaulting peaceful protesters. In another incident during the protests exemplifying the failure of APD officers to intervene, no fewer than three APD officers all used excessive force on a single non-violent protestor on May 30, 2020: Officer John Siegel sprayed Jason Gallagher in the face, then while Gallagher was still reacting to the pain of the first attack, Officer Salvador Gonzalez-Galvan also sprayed him in the face. When Gallagher turned away and tried to wipe his eyes, Officer Bryan McCulloch shoved Gallagher down a concrete hill while he was effectively blinded by the OC spray, causing significant injury to Gallagher.

n. **Armando Herrera-Amaro** – On December 1, 2020, APD officers Gadiel Alas and Alexander Khidre brutally tasered and hit an autistic, bipolar Hispanic young man for no

justifiable reason. The force used by Officer Alas was excessive, unreasonable, and pure police brutality. Despite the egregious nature of the abuse, which was caught on video, another APD officer stood by and helped it happen. As a consequence, Amaro faced bogus charges for nearly two years before the County Attorney dismissed them. Tellingly, APD's leadership approved of Alas' misconduct and his fellow officer's decision to allow it to continue.

62.    In 2017, United States District Judge Sam Sparks of the Western District of Texas, summarized other incidents where APD officers failed to intervene to stop fellow officers from using excessive force in an order denying summary judgment to the City:

   a.  **Officer Richter** – in the presence of another officer, threw a suspect who was not resisting to the ground by the neck;

   b.  **Officer Richter** – in the presence of two other officers, shot with a TASER a suspect who was not resisting and had complied with Richter's commands.

63.    The City ultimately settled the claims against the City and Officer Richter at issue in Judge Sparks' 2017 order for $425,000. In that litigation, unrelated to the two incidents identified above, Richter had assaulted Breaion King, who he had pulled over for a minor traffic violation. Richter was not disciplined or retrained for brutalizing this young woman until after the press learned about his brutality and made the assault public.

64.    In total, from 2006 to 2017, APD officers used force on 18,297 people—on average each person's use of force involved 1.6 APD officers. Thus, like this case, in many thousands of incidents, multiple APD officers were present but the use of force occurred anyway.

65.    APD's own reports reflect that its officers routinely use force against those who are not resisting at all—like Johnson—as well as those who it deems to be engaged in mere "verbal,"

"passive," or "defensive" resistance. This is despite the fact that any significant force against people engaged in that level of resistance is unconstitutional.

66.    APD's reports reflect that from 2006 to 2016, APD used force against 1,159 people who only exhibited "passive" resistance, 838 people who only exhibited "verbal" resistance, and 6,626 who only exhibited "defensive" resistance.

67.    During the middle of 2017, APD changed its reporting metric so the type of resistance is not available during that year.

68.    From 2018 through 2020, APD used force against 58 people who did not resist, 310 people whose resistance was "passive," and 4,148 people whose resistance was only "defensive."

69.    From 2017 to 2020, APD began using force 58% more often—while making 51% fewer arrests.

70.    During an independent review of a small fraction of uses of force, authorized by the City of Austin, 112 uses of force (against 88 individuals) in late 2019 were found to be inappropriate, despite approval of the officers' use of force by APD supervisors.

71.    The same review further found that APD officers frequently command individuals to get on the ground when there is no reason to do so, just like Salter did in this case.

72.    The same review also found that APD officers frequently punch the back or side of the heads of people on the ground when there is no reason to do so, just like Salter did in this case.

73.    The same review found that the APD use of force process lacks proper internal supervisory review and investigation which frequently fails to address the appropriateness of the use of force used against members of the public.

74.    The same review criticized APD for failing to require that officers document when they point their guns at citizens, just like Salter did in this case, obscuring how often this occurs.

75.   The same review also found that APD officers used neck restraints and head strikes when that level of force would not have been appropriate—as that force can have lethal consequences—on multiple occasions, just like Salter's use of both in this case.

76.   Upon information and belief, because the aforementioned practices were so widespread that only a limited review of uses of force during 2019 detected all of them, they were also so widespread that the chief of police actually know of, but failed to ameliorate, these practices at the time APD officers abused Johnson in the exact same manner.

77.   Upon information and belief, there are numerous other incidents where APD officers used excessive force, failed to intervene to stop excessive force by law enforcement, or both.

### C.  APD's Pattern of Excessive Force is Evidenced by its Training Academy and Culture of Violence.

78.   At the time of this incident, the City operated a stress-oriented military-style police training academy where multiple cadets had resigned due to the toxic, abusive, and combative teaching methods that embraced intimidation tactics.

79.   APD historically has been strongly reluctant to change the paramilitary nature of the Academy in any fundamental way, and even recently fired the staff hired to evaluate and make recommendations to change the training.

80.   As such, the APD Academy utilizes "teaching" techniques like yelling and screaming at cadets, and other humiliating tactics, which serve little purpose other than to instill a military-like, bootcamp atmosphere that was counterproductive to preparing officers to actually serve the community.

81.   This combative attitude is likely a cause of Noble's and Salter's decisions to deploy unreasonable attacks on Johnson—and to escalate to repeated, unnecessary, and potentially life altering blows to an unarmed, helpless suspect's face.

82.    In fact, APD's training reflected an 'us vs. them' mentality that often escalated encounters between police officers and the public—much like how the officers' conduct in this case only served to escalate a confrontation for no reason.

83.    According to reports, the Academy's paramilitary atmosphere was abusive to cadets, and encouraged them to abuse members of the public. Instructors relentlessly ridiculed and mocked cadets during physical training.

84.    Cadets described how instructors frequently yelled and cursed at them, leading these cadets to believe the Academy would create police officers who were indifferent to the community.

85.    A group of former cadets alleged that the Academy encouraged a culture of abuse towards citizens. One former cadet alleged that instructors told cadets that they would "punch them in the face" if they said they wanted to be police officers to help people.

86.    Another instructor told cadets to "pick someone out of a crowd … and ask yourself, 'how could I kill that person?'"

87.    As a result, the message absorbed by the cadets was that the Austin community—including members like Johnson—was the enemy.

88.    The culture of APD's training academy reflects the culture of the department and impacts the mindset and approach to policing of every individual officer, including Defendants.

89.    These problems with APD's training academy had been festering for years by the time of this incident, and were well-known to its policymakers, including the chief of police

90.    Apart from direct complaints about the training academy, APD also knew the results were disastrous.

91.    The Office of the Police Monitor (OPM), an agency created by the City to facilitate public complaints against police officers, participated in investigations of APD officers and made non-binding policy recommendations to APD.

92.    OPM recommended APD rethink its missing de-escalation training and aggressive tactics as early as 2007—based on 2005 data—due to a high number of complaints and allegations of misconduct.

93.    For 2005, OPM reported citizens made a total of 73 use-of-force-related allegations, and succeeding years saw between 47 and 123 such complaints each year through 2015, for a total of 815 allegations of excessive force reported to OPM from 2004 to 2015.

94.    Critically, every year beginning in 2009, OPM warned that this number was under-inclusive, with succeeding reports stating that APD was not obeying its own written use-of-force complaint and investigation procedures—hampering oversight of misconduct both by deterring citizens from raising excessive force matters and by failing to internally investigate potential excessive uses of force.

95.    In 2015, OPM observed that multiple high-profile cases highlighted the deficiency in the manner in which APD reviews responses to resistance or uses of force.

96.    The OPM emphasized that the uses of force against Breaion King and another use of force against Tyrone Wilson—a young man who was pepper sprayed in the face while handcuffed in the back of a prisoner transport van for despite only harmlessly kicking the van door—were originally determined by APD to be reasonable, only to later result in officer discipline when the videos were leaked to the press.

97.    In August 2016, then-APD Chief Art Acevedo admitted that APD officers "have this attitude of" falsifying reports about using force with "creative writing." Sadly, Chief Chacon has

continued the pattern of failing to discipline numerous officers who filed reports with misleading or false information.

98.   In 2015, OPM again recommended APD revise policies and training for de-escalation and officer communication, but APD again declined.

99.   As a result, APD officers like Defendants continued to unnecessarily escalate encounters with violence, and continued to fail to intervene to stop excessive force by their fellow officers.

   D.  **APD's** INADEQUATE MENTAL HEALTH RESPONSE POLICIES ROUTINELY RESULT IN EXCESSIVE FORCE.

100. Due to an array of well-known dangerous policies, APD routinely uses excessive force against people experiencing mental health crises like Johnson.

101. Police officers often encounter citizens experiencing mental health crises.

102. In Austin, APD is dispatched more than twice as frequently to mental health crises than emergency medical services.

103. APD reported from 2017 through 2020 that its officers used force against 1,619 people who were either mentally unstable or emotionally disturbed persons but were, like Johnson, not impaired by any drugs or alcohol.

104. In addition, APD officers used force against 1,803 people who were impaired by drugs or alcohol and either an emotionally disturbed person or mentally unstable from 2017 through 2020.

105. From 2017 through 2020, APD officers used force far more frequently during encounters with individuals with mental health issues compared to encounters with those without.

106. Encounters between police and mentally ill citizens often lead to death or permanent injury for the mentally ill person in Austin.

107. APD officers used firearms, caused hospitalizations, killed, or struck in the head 26 mentally unstable or emotionally disturbed people from 2019 through 2020.

108. Austin police officers are trained to respond to a person who threatens to kill themselves as if that person is *homicidal*.

109. Thus, Austin deliberately trains its officers to overreact to a person who threatens to kill themselves.

110. APD officers routinely disobey the department's own mental health policies.

111. Instead, dispatchers are not authorized to assign a Crisis Intervention Technique certified officer directly to a call.

112. Moreover, as of 2019, APD 911 call takers and dispatchers were not trained to recognize or manage mental health crisis calls. By the time of this incident, some of these staff had received incomplete training.

113. Chief Chacon has been specifically aware that this deficiency in dispatch was dangerous, as it was reported and publicly criticized by the City Auditor in September 2018, the Citizen Review Panel that reviewed the death of David Joseph, and the Meadows Institute in a City-funded report in 2019.

114. As of 2019, APD 911 call takers and dispatchers are also not integrated with mobile crisis outreach teams or clinical triage services, even though those teams and services are provided by a different Austin agency, so neither of those sources of mental health care is accessible from 911.

115. This deficiency was known to Chief Chacon, as it was specifically criticized by the Meadows Institute in a City-funded report in 2019.

116. By the time of this incident, APD incorporated some triage services into 911 dispatch, but not during the evening hours when mental health calls are most common—thus, there was no triage service available at the time of the calls regarding Johnson.

117. As Chief Chacon was personally involved in making the partial change to 911 dispatch, he knew that it did not encompass the recommended time period and was deficient for evening services.

118. Thus, in scenarios like this encounter with Johnson during the evening, it falls on APD officers to ask for mental health services.

119. Yet, APD officers routinely ignore the appropriate procedure for mental health crises, like in this case: APD officers routinely do not wait to assess the suicide threat or consult mental health services before resorting to force.

120. That is exactly what Noble, Salter, and Alzola did to Johnson.

121. APD also failed to track and review crisis intervention incidents until 2021, as it made no effort to improve its deplorable mental health response practices but instead chose to deliberately obscure its failures.

122. Chief Chacon has been specifically aware that this deficiency in reporting obscured APD's mental health failures, as it was reported and publicly criticized by the City Auditor in September 2018, by the Citizen Review Panel in its review of the use of deadly force against a mentally ill man on Aug. 20, 2015, and by the Meadows Institute in a City-funded report in 2019.

123. APD also provides no training in responding to suicide calls involving a suspected weapon.

124. APD further trains its officers *not* to use any mental health response techniques until *after* the subject is cooperative—so in the case of a suicide threat, according to APD's specific training, no mental health crisis response techniques may be deployed when those methods might save lives or de-escalate a situation.

125. Although Austin has a mobile crisis outreach team service that can provide a mental health clinician to respond to a mental health crisis, and that clinician can be deployed remotely such as

by telehealth (such as with an iPad connected to the physician that the officer carries), APD routinely delays attempting to use this service indefinitely. APD will not attempt to use telehealth unless the scene is secure—again ensuring that the service will not be deployed when it is needed most.

126. Thus, in cases like this encounter with Johnson, APD officers routinely yell aggressively and use inappropriate force—like Salter and Noble did—rather than try to de-escalate the encounter safely or call a mental health provider to do so.

127. Chief Chacon, and former Chiefs Manley and Acevedo, were personally aware of this deficiency in training, as the Citizen Review Panel recommended this problem be fixed when it reviewed APD's use of force on mentally ill, suicidal woman whose identity is known to the City on February 12, 2016.

128. Former Chief Manley has also publicly acknowledged that these deficiencies arise in part from fiscal decisions. This remained true in 2021: Austin chose not to pay for mental health providers to be available for emergency telehealth or triage services during the early morning hours and has chosen not to provide monetary incentives for all patrol officers to receive CIT training.

129. APD officers used deadly force on at least 18 people with mental illness from 2010 through 2017, killing Jason Roque, David Joseph, Richard Monroe, Morgan Rankins, William Mann, Tyler Hunkin, Ray Ojeda, Micah Jester, Cassandra Bolin, Michael Holt, Tyler Caraway, Larry McWilliams, Herbert Babelay, Mark Guard, Jamaryl Tyler, Gene Vela, Evan Schaffrath, and Patrick Faith.

130. APD officers shot another 20 people experiencing a mental health-related crisis from 2010 to 2016, but those victims survived.

131. APD officers also shot and killed Paul Cantu while he was suffering a mental health crisis

on January 29, 2019.

132.  As a result, Austin has the highest per capita rate of fatal police shootings involving persons believed to be experiencing a mental health crisis of the largest cities in the United States.

133.  Moreover, an external review of APD, commissioned by the City of Austin, reviewed uses of force in late 2019 by APD and identified 21 uses of force that involved a mental health component where the officers engaged in misconduct—over 90% of which was the inappropriate use of force.

134.  **Jane Doe #1 -** One incident identified as inappropriate by the external review involved Jane Doe #1, a 57-year-old white female was reported to have a "fake" gun in her home and wanted to kill herself. Officers responded with body armor, Kevlar helmets, and a patrol rile. The officers called into the house and asked Doe #1 to exit the home—just like with Johnson. Doe #1 complied by exiting the home, just like Johnson. The officers saw that Doe #1 was visibly unarmed—just like Johnson—as she was dressed only in a t-shirt and a bikini under bottom. Despite this, when Doe #1 turned to re-enter her home—similar to Johnson—officers shot her in the left buttocks with a "less lethal" bean bag projectile.

135.  **John Doe #2** – Another incident identified as inappropriate by the external review involved John Doe #2, a 34-year-old white male who called 911 on himself, reporting he had a personality disorder and needed assistance. Despite Doe #2 having a small build, being nonviolent, and appearing to be in distress, three officers were dispatched and one officer initiated a body slam takedown of Doe #2. The officer falsely reported that Doe #2 lunged at him, contrary to video footage, and the use of excessive force was approved by a supervisor.

136.  **Jane Doe #3** – In a third incident identified as inappropriate by the external review, three APD officers responded to a disturbance involving Jane Doe #3, a 48-year-old white female, and

her boyfriend. The officers knocked on her door and Doe #3 declined to let them in because she was naked. Nonetheless, similar to the officers in this case, the officers forced their way inside Doe #3's home, forced her to the ground, handcuffed her, and arrested her for resisting. One officer claimed her demeanor was aggressive in his report and that the naked woman threatened their safety while she was on the ground. These allegations were contradicted by video evidence, which further showed Doe #3 was experiencing a mental health related incident, yet an APD supervisor approved the use of excessive force and the false arrest.

137. As a result of these glaring policy failures, APD has used excessive force against many mentally ill people and people experiencing a mental health crisis. High profile incidents of misuse of force against people suffering mental health issues known to Chief Chacon and the City Council include the Roque shooting discussed above and the following:

    a. On July 5, 2015, Alexander Munroe called 911 early in the morning, saying he felt suicidal and wanted someone to talk to. Munroe asked the dispatcher not to send officers, and she promised not to, but she did anyway. Officers Matthew Murphy, Stephen Johnson, and John Nelson arrived at Munroe's home. After they confronted Monroe, he sat on his porch with a BB gun in his lap and continued speaking to the 911 dispatcher on his cell phone. Murphy snuck up behind Munroe and shot him in the back with a TASER—similar to Noble's tactic with Johnson. Less than two seconds later, all three officers opened fire, hitting Munroe a total of six times and killing him. The United States District Court for the Western District of Texas, Judge Lee Yeakel, denied summary judgment to officers Murphy and Johnson on March 12, 2018. On July 28, 2018, the City agreed to pay $895,000 to settle claims with Munroe's parents.

b.  On February 8, 2016, then-Officer Geoffrey Freeman fatally shot David Joseph, who was just seventeen, while Joseph, suffering a mental health crisis, was running naked around a suburban area. Freeman found Joseph, naked and obviously unarmed, standing in the middle of a residential street. Freeman exited his vehicle with his sidearm already drawn, and shouted at Joseph not to move. Confused, Joseph instead ran towards Freeman, who opened fire, killing Joseph. APD terminated Freeman and concedes the shooting was not justified. The City paid Joseph's mother $3,250,000 to settle her claims.

E.  **APD's History of Excessive Force**

138.  The Austin Police Department also has a long, well-documented history of using excessive force.

139.  In addition to the high-profile incidents above, APD officers additionally killed or brutalized other citizens in cases that Chief Chacon and the City Council were well aware of.

a.  On June 9, 2005, then-Officer Julie Schroeder engaged in a struggle with Daniel Rocha, who was trying to flee an arrest. When Rocha turned away from her, Schroeder shot him in the back, killing him. The United States District Court for the Western District of Texas, Judge Lee Yeakel, denied summary judgment on July 6, 2007 in a suit brought by Rocha's family. The Fifth Circuit Court of Appeals affirmed on July 27, 2008. The lawsuit settled for $1,000,000. APD admits Schroeder's use of force was unreasonable.

b.  On June 3, 2007, APD Sgt. Michael Olsen fatally shot Kevin Brown, after Olsen chased Brown alone into a field. Olsen shot Brown multiple times including while Brown lay on the ground. Olsen rushed into the confrontation without a plan and then claimed that Brown appeared to be reaching for a weapon, even though Brown dropped his weapon moments earlier (and dozens of feet from where Olsen shot him). APD admitted that

Olsen's use of force was unreasonable, and paid Brown's family a settlement of $1,000,000.

c. On May 11, 2009, then-APD-Officer Leonardo Quintana shot Sir Smith after approaching his car while he was unarmed and asleep. Quintana and another APD officer came up on the car from behind, and could tell through the car windows that both occupants were asleep. Instead of making a plan and communicating with his partner, Quintana opened fire on the car, shooting through the car's rear windows. Smith, unarmed and suddenly under fire, awoke from sleeping and tried to escape by running from the car, but Quintana shot him after he exited the car. Quintana was only disciplined for failing to activate his squad car's video camera, though an independent investigation by the City's Office of the Police Monitor sharply criticized APD's investigation. Quintana's partner did nothing to intervene and, on information and belief, was not disciplined. The City paid Smith $175,000.

d. On April 5, 2012, Officer Copeland (the same officer who abused Carlos Chacon, discussed above) shot and killed Ahmede Bradley during a traffic stop. Copeland had not been re-trained or disciplined in any meaningful way after brutally beating Carlos Chacon. Bradley initially fled the stop, then pulled over again, exited his vehicle, and ran away on foot. Copeland angrily gave chase on foot and shouted that he would kill Bradley. Copeland electrocuted Bradley with a TASER, then kicked and struck Bradley before fatally shooting Bradley three times. The United States District Court for the Western District of Texas, Judge Lee Yeakel, denied summary judgment on January 6, 2016. Then-Police Monitor Frasier, the former Sheriff of Travis County, told the then-

chief that the shooting was unjustified, particularly because Bradley was trying to escape so that he was not an immediate threat requiring deadly force.

e.  On July 29, 2013, APD Det. Charles Kleinert fatally shot Larry Jackson, Jr. Kleinert chased Jackson on foot from a bank fraud call, and even requisitioned a civilian vehicle to continue the chase, before cornering Jackson alone under a bridge. Kleinert fired his gun at point blank range after engaging in a fist-fight with Jackson. Jackson was unarmed. Kleinert resigned in lieu of discipline, but APD acknowledges his use of force was unjustified and the City settled the family's civil claim for a total of $1,850,000.

f.  In March 2014, APD Sgt. Greg White shot Jawhari Smith after confronting Smith when Smith was holding a small BB gun. Smith honestly and immediately told White that the "pistol" was just a BB gun and immediately held it up in his right hand over his head, *according to White*. Both Smith and a bystander reported Smith then quickly dropped the BB gun on the ground. White shot Smith, though his patrol car audio recording shows White gave Smith less than two seconds to comply with his commands to drop the BB-gun. APD did not discipline White, but the City paid Smith a settlement.

g.  On April 24, 2020, APD Officer Christopher Taylor shot and killed Michael Ramos, who was unarmed. Taylor and other APD officers pulled up to Ramos and a passenger sitting in his vehicle. They ordered Ramos to exit his vehicle at gunpoint. Ramos complied, begged them not to shoot, asked what was going on, and said he was not armed. When Ramos continued to stand with his hands up and complain that he had done nothing wrong, another APD officer, Mitchell Pieper, shot him with a "less lethal" weapon. In response, Ramos ducked back into the car and attempted to drive away from the police. As the vehicle moved away from the officers, Christopher Taylor shot into the cabin with

a firearm, killing Ramos. Taylor has been indicted for murder, but not disciplined by APD.

## IV.  CAUSES OF ACTION

### A.  FOURTH AND FOURTEENTH AMENDMENT EXCESSIVE FORCE BY DEFENDANTS NOBLE AND SALTER

140. Defendants Noble and Salter, while acting under color of law, brutally attacked, electrocuted, and punched when Johnson posed no danger to anyone.

141. Noble and Salter's use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Johnson to suffer serious injuries. Therefore, both Noble and Salter's actions violated Johnson's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

142. As a direct and proximate result of Noble and Salter's actions, Johnson suffered and continues to suffer significant injuries.

143. Noble and Salter were acting under color of law at all relevant times.

### B.  FOURTH AND FOURTEENTH AMENDMENT BYSTANDER EXCESSIVE FORCE BY DEFENDANTS NOBLE, SALTER, AND ALZOLA

144. Defendants Noble, Salter, and Alzola, while acting under color of law, watched on while Noble and Salter attacked Johnson without cause, and failed to intervene as bystanders to protect Johnson, in addition to assisting in the use of that force (and in Noble and Salter using their own excessive force against Johnson).

145. Defendants Noble, Salter, and Alzola each knew there was no possible justification for attacking Johnson, because they saw that Johnson was peacefully re-entering his own home when Noble electrocuted him from behind. They further saw that Johnson was subdued, face down on the ground, while Salter struck him repeatedly in the face and then when Noble electrocuted him.

Noble, Salter, and Alzola's failure to intervene to stop their fellow officers, when they were present at the scene, had the ability to do so, and failed to take reasonable measures to protect Johnson from the officers' use of excessive force, caused Johnson to suffer serious injuries.

146. Nonetheless, Noble, Salter, and Alzola did not stop the officers' use of force at any point or make any attempt at de-escalation despite knowing the force was excessive and having sufficient time to stop it. Instead, Noble and Salter inflicted excessive force of their own, while Alzola assisted such as by releasing Johnson to allow Noble to electrocute him again. Noble and Salter's use of force was objectively unreasonable in light of clearly established law, and directly caused Johnson to suffer serious injuries.

147. Noble, Salter, and Alzola were acting under color of law at all relevant times.

## C. Fourth and Fourteenth Amendment *Monell* Claim Against Defendant City of Austin Only

148. Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

149. The conduct by the officers discussed in this complaint and described herein constituted excessive force and failure to intervene in violation of the Fourth Amendment United States Constitution, as incorporated through the Fourteenth Amendment.

150. At all material times, the officers acted under color of state law, as agents of Defendant City of Austin.

151. At all material times, Noble, Salter, and Alzola wore their official department uniforms and were acting within the course and scope of their duties as City of Austin police officers at the time they assaulted Johnson and failed to intervene to stop the assault.

152. Defendant City of Austin's policymaker for all matters related to the activities of the Austin Police Department was Interim Chief Joseph Chacon.

153. The City of Austin had or ratified the following policies and/or practices in place when

Officers Noble, Salter, and Alzola and other officers assaulted Johnson and/or failed to intervene to stop the assault:

- Failing to train officers regarding their obligation to intervene as bystanders to stop fellow officers from using excessive force;

- A pattern, practice, or custom of officers failing to intervene as bystanders to stop fellow officers from using excessive force;

- Failing to discipline officers who did not intervene as bystanders to stop fellow officers from using excessive force;

- Failing to train officers in the proper measure of force, including but not limited to TASERs and head strikes, and alternatives to force during an encounter with mentally-ill citizens or citizens experiencing a mental health crisis;

- A pattern, practice, or custom of officers using excessive force disproportionately against mentally-ill citizens and citizens experiencing a mental health crisis;

- A pattern, practice, or custom of officers pointing their firearms at nondangerous people;

- Training officers not to use mental health crisis de-escalation techniques and not to call for mental health resources for an individual experiencing a mental health crisis;

- A pattern, practice, or custom of officers failing to call for mental health resources when encountering mentally-ill citizens and citizens experiencing a mental health crisis;

- Training officers to engage in the use of routine, excessive force;

- A pattern, practice, or custom of officers using excessive force including, but not limited to, resorting to head strikes and other deadly force in the face of no resistance, passive resistance, verbal resistance, or defensive resistance;

- On information and belief, hiring, retaining, and failing to retrain Noble, Salter, and Alzola despite knowing they had a history of using excessive force;

- Training officers in an "us vs. them," militaristic and warriorlike manner that promotes excessive force;

- Failing to report misconduct, i.e., employing a code of silence amongst police officers so that wrongdoing is not remedied.

154. On information and belief, APD supervisors, including Chief Chacon, reviewed Noble, Salter, and Alzola's conduct with regard to Johnson. Incredibly, despite video of the event, Chief

Chacon found no problems, and took no action. The City of Austin approved their conduct and the basis for it.

155. Noble, Salter, and Alzola, Chief Chacon's subordinates, violated Johnson's constitutional rights, when Chief Chacon failed to supervise them by failing to train them regarding their obligation to intervene to stop excessive force, failing to train them not to treat the community as their enemy, failing to train them they were prohibited from brutalizing mentally ill citizens who posed no threat to anyone (like Johnson), and failing to supervise officers to ensure they followed this obligation, and the other above delineated policies, all of which proximately caused the violation of Johnson's constitutional rights. Chief Chacon was deliberately indifferent to the known and obvious consequences of these policies, practices, training, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Chief Chacon was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

156. Chief Chacon was aware of the pattern of similar incidents that occurred before and after the officers assaulted Johnson, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of the City's above delineated policies. Chief Chacon was specifically aware that his officers had violated the constitution by using excessive force and failing to intervene in each of the specific incidents of excessive force listed in this complaint, as well as in other thousands of other incidents reported by APD, and that no additional procedures, policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to citizens.

157. Likewise, Chief Chacon knew or should have known that failing to train his officers that

they were obligated to stop other officers from using excessive force was a particular omission in the City's training program that would cause City employees to violate the constitutional rights of members of the public they encountered, like Johnson. Nevertheless, though Chief Chacon knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

158. Rather, the Austin Police Department hierarchy and Chief Chacon ratified Officer Noble, Salter, and Alzola's conduct, and continued to approve and their mistreatment of Johnson.

159. In any event, each of the policies delineated above was actually known, constructively known and/or ratified by the City of Austin and its policymakers, including Chief Chacon, and was promulgated with deliberate indifference to Johnson's rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that APD officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

160. Consequently, the policies delineated above were a moving force of Johnson's constitutional deprivations and injuries, and caused him to suffer serious injuries.

## V.  DAMAGES

161. Plaintiff James Johnson seeks the following damages:

     a.     Past and future lost wages and loss of earning capacity;

     b.     Past and future physical pain;

     c.     Past and future mental anguish;

     d.     Past and future impairment;

     e.     Past and future disfigurement;

     f.     Past and future medical expenses;

g.      Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988;

h.      Pre-judgment and post-judgment interest at the highest rates allowable under the law;

i.      All other compensatory and/or general damages to which Johnson is entitled under state or federal law; and,

j.      Punitive damages in the highest amount allowed by law against Defendants Noble, Salter, and Alzola only.

## VI.  JURY DEMAND

162. Plaintiff respectfully requests a trial by jury.

## VII.  PRAYER FOR RELIEF

163. To right this grave injustice, Plaintiff requests the Court:

a.      Award compensatory damages to the Plaintiff, against all Defendants;

b.      Award punitive damages to Plaintiff against Defendants Noble, Salter, and Alzola only;

c.      Award Plaintiff costs, including expert fees and attorneys' fees pursuant to 42 U.S.C. § 1988;

d.      Award pre-judgement and post-judgment interest at the highest rate allowable under the law; and,

e.      Award and grant such other just relief as the Court deems proper.

Dated: October 18, 2022

Respectfully submitted,

**EDWARDS LAW GROUP**
603 W. 17th St.
Austin, TX 78701
Tel.  512-623-7727
Fax.  512-623-7729

By_____/s/ Jeff Edwards_____
      JEFF EDWARDS
      State Bar No. 24014406
      jeff@edwards-law.com
      DAVID JAMES
      State Bar No. 24092572
      david@edwards-law.com
      PAUL SAMUEL
      State Bar No. 24124463
      paul@edwards-law.com

      **ATTORNEYS FOR PLAINTIFF**